# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**VALCOS BLISS,**
   **Plaintiff,**

  v.              Case No. 07-C-1108

**CHRISTOPHER S. CHU,**
**KIMBERLY FOSTER, and**
**CITY OF MILWAUKEE**
   **Defendants.**

---

## DECISION AND ORDER

Plaintiff Valcos Bliss brings this § 1983 action against City of Milwaukee Police Officers Christopher S. Chu and Kimberly Foster, alleging that Chu and Foster used excessive force in violation of the Fourth Amendment by shooting him during an arrest. Before me now is defendants' motion for summary judgment.[1]

### I. BACKGROUND

During the late morning of August 14, 2006, Tanya Bliss received a call at work from her young son, Adrian, who said that someone was trying to break into their house, which was located in an urban residential area in the City of Milwaukee. Bliss told her son to press the panic button on the alarm system, call 911, and get out of the house. She immediately left work, and by the time she arrived home Officers Chu and Foster were

---

[1] In his original complaint, plaintiff named the City of Milwaukee as a defendant but did not assert a claim under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978), against the City. Subsequently, plaintiff moved to amend the complaint to add a <u>Monell</u> claim. However, plaintiff has since withdrawn his motion to amend. Therefore, the City of Milwaukee will be dismissed as a defendant on the ground that plaintiff no longer intends to pursue a claim against it.

present, along with other officers. Chu and another officer searched the house and found no signs of forced entry or anyone inside. After the house was cleared, all of the officers except Chu and Foster left the scene. Chu then walked around the property with Ms. Bliss, while Foster remained in front of the house with Adrian. Eventually, Chu and Bliss approached an alley that ran along the back of the property, where they encountered a Cadillac DeVille parked close to Bliss's neighbor's garage.

The Cadillac contained three occupants, including Ms. Bliss's brother, plaintiff Valcos Bliss, who was in the back seat. Valcos Bliss had just been released from prison and was living at his sister's house. He had been out all night smoking crack cocaine, and on his way home in the morning he ran into two women, Jennifer Hunt and Peggy Stewart, while walking down the street. Hunt was driving Stewart's Cadillac. Bliss and Hunt knew each other from when they were children, and Bliss had just met Stewart three days earlier. Bliss got into the back seat of the Cadillac and suggested that all three drive to his sister's house and smoke crack cocaine. The women agreed, and when they arrived at Ms. Bliss's house they parked the car in the alley behind the house with the driver's side close to the door of the garage on the property just south of Bliss's. The car was parked close enough to the garage that the driver's side door would have just touched the garage if opened. Hunt left the keys in the ignition and the car running. The occupants then began to smoke crack.

It was at this point that Officer Chu spotted the Cadillac, and he decided to conduct a field interview of the occupants to determine what they were doing and why they were located in the vehicle behind the garage. As Chu approached the rear of the vehicle, one of the occupants exclaimed something along the lines of "Oh shit, the cops." Hearing this,

2

Chu began to suspect that the occupants were engaged in illegal activity. He also observed the occupants make furtive movements, as if they were hiding weapons, drugs or other paraphernalia. As a precaution, Chu drew his service weapon from its holster. He approached the rear driver's side of the vehicle and ordered the occupants to raise their hands. Bliss and the driver complied, but the front passenger did not. Chu was concerned about the front passenger's noncompliance, and so he moved around the front of the vehicle to the passenger side. By this time, the passenger had complied with Chu's commands and put her hands up. While he was rounding the front of the vehicle, Chu noticed Officer Foster appear in the alley near the rear of the vehicle, on the driver's side.

Chu ordered the front passenger to exit the vehicle, and she complied. Around the same time, the driver of the vehicle – either pursuant to an order from one of the officers or on her own initiative – exited the vehicle through the driver's side door. Foster, who was still located on the driver's side of the vehicle, took custody of the driver and leaned her against the garage door. Chu and the passenger were located near the rear of the vehicle on the passenger side, and the passenger's hands were on the car. At this point, both the driver and passenger side doors were open and, at least according to plaintiff, the car was running.

Chu and Foster had a discussion (plaintiff says an argument) about how to best position the driver, Hunt. Bliss, who was still in the back seat, noticed that Chu and Foster seemed distracted by their discussion and decided that this would be a good time to try and escape. He went feet first from the back seat to the front seat of the vehicle, slid into the driver's seat, and reached for the steering column. This caught Foster's attention, and she drew her weapon and began to approach the open driver's side door, moving from the

3

rear area of the car towards the driver door area. Because the car was parked so close to the garage, Foster had to move between the garage and the car, within the "wingspan" of the open driver's side door. By this time, Bliss had shifted the car into "drive," though Foster did not know what gear the car was in. Foster warned Bliss to stop what he was doing and get out of the car or she would shoot. Bliss did not stop, and according to at least one witness (Stewart) the car began to move forward from being put into gear. (Bliss did not step on the gas, but neither was his foot on the brake pedal – both feet were on the floor of the car. Under Foster's version of events, the car did not move forward at all.) Foster then fired one shot at Bliss, hitting him in the left thigh. The pain caused Bliss to sprawl over onto the passenger side of the car.

As these events were unfolding, Officer Chu was still located near the rear passenger side of the vehicle with the passenger, Stewart. The facts relating to his actions from this time forward are heavily disputed. Under Bliss's version of events, after Foster shot him, he pushed himself up from the passenger seat and got back behind the wheel. The next thing he saw was Chu coming in the open passenger door, holding his gun in both hands with his arms extended and the gun pointed at Bliss. Bliss then turned to face Chu, put his hands up, and held them open. At some point, Bliss started swinging his arms at Chu to get him to stop pointing the gun at him. Meanwhile, because the car was in gear and no one was applying the brakes, the car was traveling forward across the alley, in an arc towards the right. A few moments later, the car crashed through a backyard fence and came to rest with the driver's side door closed and pinned against a garage. Bliss then put his back against the driver's side door and said "don't shoot." According to Bliss, Chu

4

ignored his plea and fired four shots, three of which struck Bliss in the abdomen. The next thing Bliss knew, he was waking up in the hospital.

Chu's version of events is that once he realized that Bliss had climbed over the seat and behind the wheel of the car, he ordered the passenger, Stewart, to sit on the ground. He then rushed toward the open passenger door, drawing his weapon and yelling "let me see your hands." Bliss put his hands up, said "I'm coming out," but remained seated. Chu looked into the car, and when he saw that Bliss's hands were up and that he was not holding a weapon, Chu holstered his weapon. Chu started to reach into the car from the passenger side to pull Bliss out of the vehicle while controlling his hands. However, before Chu could take control of Bliss, Bliss slid behind the wheel and reached with his right hand towards the steering column. Chu yelled "don't do it," thinking that Bliss was trying to flee. Chu saw Bliss put the car into drive and at the same time heard a gunshot coming from the driver's side of the vehicle. The shot came from Foster, but at the time Chu did not know that and thought that maybe Bliss had a gun. Chu drew his gun once again, and the car began to move forward. Somehow, Chu ended up inside the car on the passenger side with the passenger door closed. Chu could feel the car moving and by this time had concluded that Bliss did not have a gun in his hands. Chu told Bliss to stop the car, and Bliss responded by saying "don't shoot me." Bliss turned to face Chu and abandoned control of the vehicle. He grabbed Chu's right hand, which was the hand holding the gun. Bliss and Chu began struggling, and during this struggle the back of the passenger seat broke, causing Chu to fall back and Bliss to fall on top of him. The struggle continued, and Bliss turned Chu's gun toward him, such that Chu was looking into the barrel of his own gun. Chu was able to turn the weapon away from himself, and he decided to fire a shot,

5

hoping that it would cause Bliss to stop struggling. Chu fired the shot, but Bliss did not stop. Chu then fired additional shots, and this caused Bliss to stop, enabling Chu to get up and out of the vehicle, which by this time had come to a stop. As noted, three of Chu's shots struck Bliss in the abdomen.

On December 12, 2007, Bliss filed the present action against Chu, Foster and the City of Milwaukee, alleging two counts of use of excessive force in violation of the Fourth Amendment.

## II. ANALYSIS

Plaintiff's § 1983 claims against Chu and Foster are based on his Fourth Amendment right to be free from unreasonable seizures. A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable. Tennessee v. Garner, 471 U.S. 1, 7 (1985); Scott v. Edinburg, 346 F.3d 752, 755 (7th Cir. 2003). Chu and Foster do not dispute that they intentionally used deadly force against Bliss when they shot him. The only question is whether their use of such force was reasonable.

The issue of whether an intentional use of deadly force by a police officer is permissible under the Fourth Amendment requires an objective reasonableness inquiry. See Graham v. Connor, 490 U.S. 386, 399 (1989). The officer's subjective belief or motivations are irrelevant. See id. at 397 ("[E]vil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will . . . good intentions make an objectively unreasonable use of force constitutional."). The "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. "[T]he question is whether the

officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Moreover, the reasonableness analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.

In determining the reasonableness of the manner in which a seizure is effected, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 550 U.S. 372, 383 (2007) (internal quotation marks omitted). One governmental interest potentially in play in the present case is the government's interest in stopping a suspect who is trying to escape. However, as the Supreme Court clearly established in Tennessee v. Garner, the government's interest in apprehending a suspect does not always justify the use of deadly force against a nonviolent suspect. 471 U.S. at 9-12. Thus, Chu and Foster do not suggest that their use of deadly force against Bliss was justified by their desire to prevent Bliss from using the Cadillac to escape. Instead, they argue that their use of deadly force was justified by their desire to prevent Bliss from harming both themselves and the two other arrestees, Hunt and Stewart.

An officer may be justified in using deadly force in self-defense. See Edinburg, 346 F.3d at 757. Further, use of deadly force may be a reasonable response to a suspect who poses a serious risk to the safety of members of the public. Scott, 550 U.S. at 383-84. I thus consider whether the circumstances confronting Chu and Foster would have led

7

reasonable officers in their positions to believe that the use of deadly force was necessary in light of the risk that Bliss posed to the officers, Hunt and Stewart. Because the facts relating to Chu's use of force and to Foster's use of force are different, I will address each officer separately. In doing so, I view the evidence in the light most favorable to Bliss, drawing all reasonable inferences in his favor. Fed. R. Civ. P. 56; Catalan v. GMAC Mortgage Corp., 629 F.3d 676, 681 (7th Cir. 2011). However, once I identify the relevant facts and construe them as favorably to Bliss as the record will allow, the ultimate question of whether either officer's use of force was objectively reasonable becomes a pure question of law. Scott, 550 U.S. at 381 n.8.

**1.     Foster**

Foster states that she shot Bliss in the thigh in an attempt to stop him from putting the Cadillac in reverse and injuring Chu, the two female arrestees, and herself, all of whom would have been in the direct path of the vehicle had Bliss put it in reverse. It is undisputed that Foster, Chu, and the two women were in danger of being hit by the Cadillac if Bliss decided to drive it in reverse. Recall that both the driver and passenger side doors were open, and thus even those who were not directly behind the rear of the vehicle were in danger of being struck by the open doors. Bliss thus does not dispute that his driving the car in reverse would have posed a substantial risk of death or serious bodily harm to four individuals.

Bliss responds by noting that if the evidence is viewed in the light most favorable to him, the Cadillac was moving forward at the time Foster shot.[2] Thus, Bliss argues, it would

---

[2]Peggy Stewart testified as follows during her deposition: "Q: And at the time that you heard [Foster's] shot was the car moving? A: Yes.  Q: And had it just started to move?

8

have been obvious to a reasonable officer that he was trying to escape by driving the Cadillac forward and that there was no risk of him putting the car in reverse and hitting anyone. However, even if the car was moving forward at the time Foster shot, Bliss does not dispute that he had not yet put his foot on the gas, and so if the car was moving forward it was moving simply by virtue of Bliss having put the car in "drive." In other words, if the car was moving forward, it was not moving particularly fast and did not move very far before Foster shot. This is confirmed by Stewart, who said that the car had moved only "a little ways" or "a couple of feet" before Foster fired. (Stewart Dep. at 31.) So even if Foster should have known that the car was moving forward, it is not as though Bliss was well on his way out of the alley by the time she fired. Moreover, it was reasonable for Foster to think at the time she fired – as Bliss was putting the car in gear or a split second later – that there was a substantial risk that Bliss would decide to put the car in reverse. This risk would not have evaporated once the car began to inch forward. At that point, a reasonable officer would not have known with certainty that Bliss only intended to escape by driving forward, and even if the forward motion of the car reduced the risk of Bliss putting the car in reverse to below 50%, Bliss would have caused substantial harm to four individuals if he did put the car in reverse. Balancing this risk and the associated harm to four innocent individuals against the harm Foster could reasonably expect Bliss to suffer if she shot him demonstrates that Foster reasonably sought to eliminate the risk Bliss

---

A: It had moved a little ways before they actually started shooting at him . . . The car – he had gotten like a couple of feet." (Stewart Dep. at 30-31.)

posed by shooting him in the leg.³ See Scott, 550 U.S. at 383-84 (weighing danger posed by suspect against likely harm to suspect in determining whether officer's use of deadly force was reasonable). Taking the evidence in the light most favorable to plaintiff, then, Foster's use of force was reasonable as a matter of law. Summary judgment will be entered in her favor.⁴

    **2.    Chu**

The case against Chu is different. As noted, Bliss and Chu tell widely divergent stories about what happened once Chu entered the passenger side of the vehicle. Plaintiff does not seem to dispute that under Chu's version of events – in which Bliss grabbed the hand Chu was using to hold his gun and aimed it at Chu – Chu acted reasonably in self-defense. However, Bliss rightly contends that under his version of the facts Chu acted unreasonably. Under Bliss's version, which is supported by the evidence in the record, Chu got into the car with his gun drawn and pointed it at Bliss. As the car

---

³I assume that shooting Bliss was an effective means of ensuring that he did not back over everyone. However, it is conceivable that it was not. Perhaps shooting a suspect who has a chance to use a vehicle as a deadly weapon only makes matters worse, in that once the suspect realizes he is being shot at he is more likely to use the vehicle to inflict harm on those who are shooting at him. But Bliss does not oppose summary judgment on the ground that shooting him would not have eliminated the risk he posed to the officers and the two women. Rather, as discussed, he argues that Foster could not have reasonably believed that he posed any such risk. Therefore, I will not explore this matter further and will simply stick with the assumption that shooting Bliss eliminated or substantially reduced the risk he posed.

⁴In his brief, Bliss contends that a jury could reasonably conclude that Foster is lying when she says she was concerned about Bliss backing over everyone, and that her real motivation was that "she was angry and resentful that [Bliss] was ignoring her." (Brief at 10.) However, as noted, an officer's subjective belief or motivations are not relevant to the objective reasonableness analysis. Graham, 490 U.S. at 397. All that matters is that a reasonable officer in Foster's position could have concluded that Bliss posed a substantial risk to the safety of four individuals.

was moving forward from being in gear, Bliss put his hands up and at some point started swinging his arms at Chu to get him to stop aiming the gun at him. But then the car crashed through the fence and came to rest, at which time Bliss put his back against the driver's side door (which was now closed) and said "don't shoot." Chu then shot Bliss in the abdomen three times.

Under Bliss's version of events, a trier of fact could conclude that Chu had no reason to shoot Bliss when he did. Although Chu may have had cause to shoot Bliss during the time that the car was moving across the alley and Bliss was swinging at Chu's gun, by the time Chu fired the car had stopped and Bliss was pleading with Chu not to shoot. It is clearly established that "even '[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.'" Edinburg, 346 F.3d at 757 (quoting Ellis v. Wynalda, 999 F.2d 243, 247 (7th Cir. 1993)). Thus, if the trier of fact concludes that by the time Chu fired it would have been clear to a reasonable officer that Bliss was surrendering, Chu's decision to shoot at Bliss four times could not be considered reasonable. Since on the present record a trier of fact could reasonably come to that conclusion, Chu's actions cannot be considered reasonable as a matter of law.

Moreover, the dispute of fact over what happened in the moments immediately preceding Chu's use of deadly force prevents entry of summary judgment on the basis of qualified immunity. A governmental official is entitled to qualified immunity unless his or her actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." E.g., Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In Ellis v. Wynalda, the Seventh Circuit held that even if a suspect's actions

11

caused an officer to reasonably fear for his safety, once "the immediate danger had passed" the officer no longer retained the right to fire. 999 F.2d at 247. The court found that the existence of a question of fact over whether the immediate danger had, in fact, passed prevented summary judgment on the basis of qualified immunity. Thus, as of August 14, 2006, it was clearly established that the Fourth Amendment prohibited Chu from shooting Bliss after the danger posed by his actions had passed. Since it is for the trier of fact to determine whether that danger had, in fact, passed by the time Chu fired, Chu is not entitled to qualified immunity. Accordingly, Chu's motion for summary judgment will be denied.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is granted to the City of Milwaukee and Officer Foster and denied to Officer Chu.

**IT IS FURTHER ORDERED** that plaintiff's motion to strike defendants' original statement of facts is **GRANTED** and that defendants' revised statement of facts will be substituted for the stricken statement.

**FINALLY, IT IS ORDERED** that a telephonic status conference will be held on **April 6, 2011 at 2:00 p.m.** to schedule further proceedings. The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 8th day of March, 2011.

/s_____
LYNN ADELMAN
District Judge